## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **CYNTHIA CORRIE AND CRAIG CORRIE,** on their own Behalf and as Personal Representatives of the Estate of **RACHEL CORRIE AND HER NEXT OF KIN, INCLUDING HER SIBLINGS,** Olympia (Thurston County), Washington, | **Civil Action No. _____** |
| **Plaintiffs,** | **COMPLAINT** |
| **v.** | **DEMAND FOR JURY TRIAL** |
| **MOSHE YA'ALON, former Chief of Staff, Israeli Defense Forces, Israel.** | |
| **Defendant.** | |

Plaintiffs, by and through their attorneys, allege the following:

## I. PRELIMINARY STATEMENT

1.      On March 16, 2003, Rachel Corrie, a peace activist and United States citizen, was killed by IDF soldiers with a Caterpillar bulldozer while protesting the demolition of a Palestinian home while the family was inside.

2.      This is a civil action for compensatory and punitive damages against Defendant Moshe Ya'alon for violations of international, federal and state law committed against Rachel Corrie. The violations of international and state law include: war crimes, extrajudicial killing and cruel, inhuman, or degrading treatment or punishment ("CIDTP") that resulted in the death of Rachel Corrie and the other injuries described herein; negligence; and wrongful death.

3.      The IDF has destroyed at least 10,000 Palestinian homes since 1967 leaving

approximately 50,000 men, women, and children homeless.  Over the last four years, the

IDF has destroyed at least 4,100 homes.

4.      As a result of these demolitions, Palestinian civilians have been killed, injured, displaced,

and/or made homeless.  Home demolitions often take place without adequate warning and

in violation of due process rights, such as the right to a fair hearing.  The IDF rarely offers

compensation and redress to the victims.  The IDF has also destroyed civilian roads,

agricultural land, and other public and private property.

5.      The IDF has given three broad rationales for the demolitions:  1) to create "buffer zones"

that indiscriminately destroy entire neighborhoods of Palestinian homes and expel

Palestinians simply for existing near Israeli military bases or the settlements and bypass

roads or the "separation barrier" that are themselves illegal under international

humanitarian law; 2) for the purposes of collective punishment, which is prohibited by

the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of

War ("Fourth Geneva Convention"); and 3) for the purposes of demographic engineering,

i.e., to limit and discourage Palestinian population growth, especially in occupied East

Jerusalem but also near settlements in the OPT (West Bank).  These demolitions are

sometimes carried out through the discriminatory and arbitrary application of building

codes and other administrative means.

6.      The world community, including the United States, has consistently condemned these

demolitions.

7.      In 2000 the U.N. Committee Against Torture condemned the policy of demolitions; and

in 2001 the European Union did as well.

## II. JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action based on 28 U.S.C. § 1350 (Torture Victim

Protection Act) and 28 U.S.C. § 1331. The Court also has diversity jurisdiction over the

federal and state claims pursuant to 28 U.S.C. § 1332, and over the state claims pursuant

to 28 U.S.C. § 1367.

9.    Venue is proper in the United States District Court for the District of Columbia pursuant

to 28 U.S.C. § 1391(b)(3) and/or § 1391(d), as this Court has personal jurisdiction over

Defendant.

## III.  JURY DEMAND

10.    Plaintiffs demand a trial by jury in this action on all issues and all of their claims.

## IV.  PARTIES

11.    Plaintiff Cynthia Corrie is the mother of decedent Rachel Corrie, who was killed by the

IDF.  She is a U.S. citizen and resides in Olympia, Thurston County, Washington, within

the Western District of Washington.  She has been appointed a personal representative of

the estate of Rachel Corrie.

12.    Plaintiff Craig Corrie is the father of decedent Rachel Corrie, who was killed by the IDF.

He is a U.S. citizen and resides in Olympia, Thurston County, Washington, within the

Western District of Washington.  He has been appointed a personal representative of the

estate of Rachel Corrie.

13.    Defendant Moshe Ya'alon is an Israeli citizen and was at all times relevant to this action

the IDF Chief of Staff.  Defendant is now retired from the IDF.

-3-

## V. STATEMENT OF FACTS

**A. Background of Home Demolitions**

14.    The 1967 Six-Day War left Israel in control of the areas of the OPT known as the Gaza
Strip, the West Bank, the Sinai Peninsula, and the Golan Heights.

15.    Upon information and belief, since 1967, the IDF has destroyed approximately 10,000
buildings in the West Bank and Gaza areas of the OPT, leaving over 50,000 people
homeless.  According to B'tselem, an Israeli human rights organization, over 4,100
homes have been demolished in the last 4 years alone.

16.    There is consensus in the international community and among international legal bodies
that these house demolitions in the OPT are illegal under international law.

17.    Since 1967, the United Nations has condemned home demolitions as illegal under
international law, and since that time has persistently called for an end to the practice.

18.    At least since 1989, Israeli human rights organizations issued reports condemning home
demolitions as illegal methods of collective punishment in the OPT.

19.    In 1999 international human rights groups began widely reporting the human rights
violations associated with demolitions.

20.    Beginning at least in 2000, the United Nations issued a statement that Israel's policy of
demolitions may amount to cruel, inhuman or degrading treatment or punishment, as well
as a breach of Article 16 of the UN Convention against Torture and Other Cruel, Inhuman
or Degrading Treatment or Punishment, which Israel ratified in 1991.

21.    Beginning at least in 2002, the U.S. government through the State Department began
criticizing Israel for such home demolitions.

22.    The IDF has used, and continues to use, armored Caterpillar D9 bulldozers to raze blocks of homes throughout the OPT, in both Gaza and the West Bank.  The IDF has also used the same equipment to uproot hundreds of thousands of olive trees, as well as fruit orchards, causing widespread economic hardship and environmental degradation in rural areas.

23.    Rafah, where Rachel Corrie was killed, is a refugee camp and city located at the southern end of the OPT (Gaza).  The border between this area of the OPT and Egypt is 12.5 kilometers long, of which 4 kilometers run alongside Rafah.  Gaza is home to some 1.2 million Palestinians.  According to Human Rights Watch, since approximately 2000, the IDF has demolished over 2,500 houses in the Gaza region of the OPT, 1600 of which were located in Rafah.  The IDF refers to the border area alongside Rafah as the "Philadelphi" corridor or zone.  In Rafah, the IDF has frequently destroyed civilian houses, roads, and agricultural land.  Because of the IDF's demolitions, more than 16,000 people, over 10% of Rafah's population, have lost their homes.

24.    Most of the demolitions in Gaza have been aimed at depopulating Palestinian areas near Israeli settlements, bypass roads, military bases, as well as the border.  In Rafah, the IDF has used various pretexts to destroy swathes of housing to create a "buffer zone" along the border, emptied of Palestinians, in order to facilitate its long-term control over the OPT (Gaza), including with regard to its  "disengagement" from the territory.

25.     The IDF has also demolished thousands of homes in the OPT (West Bank) for various "administrative" purposes that are in reality demographically motivated.  In addition, houses have been demolished to make way for the "separation barrier" that is being built

to annex Israeli settlements in the OPT (West Bank) while encircling Palestinian communities. Discriminatory and arbitrary application of building codes in occupied east Jerusalem have resulted in house demolitions in an attempt to control and limit the growth of the Palestinian population there.

26. From April 3-15, 2002, the IDF conducted a major offensive in the Jenin Refugee Camp in the OPT (West Bank). The IDF used bulldozers to demolish residents' homes and, according to Amnesty International, the purpose was to clear paths for the IDF's tanks and other heavy weaponry. At least 140 buildings, most of them family dwellings, were completely destroyed and severe damage was caused to more than 200 others, rendering them uninhabitable or unsafe. An estimated 4,000 people, more than a quarter of the population of the camp, were rendered homeless because of the destruction. Serious damage was also done to the water, sewage and electrical infrastructure of the camp.

27. Also in April 2002, the IDF attack on the city of Nablus in the OPT (West Bank) included housing demolitions which led to at least ten deaths.

28. In general, the IDF has also demolished the homes of families or communities alleged to be connected to those thought to have participated in armed attacks against Israeli civilians or soldiers, even though such "collective punishment" is forbidden by the Fourth Geneva Convention. In many such cases, adjacent homes are also destroyed or damaged. Under international law, demolitions conducted as punitive measures are not military operations. At all times, the welfare of the local civilian population must be a primary consideration.

29. The IDF's security measures are clearly subject to requirements under international

humanitarian law, which balances the interests of an occupying power against the interests of a civilian population.  Under the Fourth Geneva Convention and other international humanitarian law, property can only be destroyed if it is "absolutely necessary" in preparation for or conduct of fighting; it cannot justify the preemptive and indiscriminate destruction of entire neighborhoods based solely on their location.  Even in instances where military operations are used to justify other demolitions, intentional attacks on civilians and civilian property are strictly prohibited under international law.

30.     As recognized by both the United Nations and international human rights organizations, most people in the Occupied Palestinian Territory who have lost their homes due to demolitions are civilians.  Further, rarely is compensation paid to the families who lose their homes.

31.     In the Occupied Palestinian Territory, when demolishing houses, not only does the IDF often fail to give warning when they are about to demolish the homes, in most instances residents are not even given a few minutes to save their personal possessions.  The IDF has demolished houses, roads, and large fields without evidence that the destruction was absolutely necessary for military operations.  The IDF has demolished blocks of houses and has indiscriminately torn up roads, destroying water and sewage networks.

32.     The loss suffered by Palestinians whose houses have been demolished is extensive and long-term.  The resulting trauma is only the first stage that the families face in coping with the new reality imposed on them.  In addition to the material damage inherent in the loss of the house and its contents, their forced displacement and total disruption in their lives and the accompanying psychological effects also serve as a punitive measure.  The

destruction has a particularly negative impact on children.

33.     IDF house demolitions are arbitrary and disproportionate and in violation of international law.  Numerous Palestinians have been killed, injured, and have been made homeless due to the demolitions.

34.     The world community, including the United States, has consistently condemned these demolitions of homes.

35.     The IDF has admitted that house demolitions have not always occurred because of military necessity.  Senior IDF officers have admitted that not all house demolitions have been authorized or justified and that destruction caused by demolitions has been excessive.

36.     According to Article 53 of the Fourth Geneva Convention, "Any destruction by the Occupying Power of real or personal property belonging individually or collectively to private persons or to the State, or to other public authorities, or to social or cooperative organizations, is prohibited, except where such destruction is rendered absolutely necessary by military operations."  This adapts the earlier Hague Regulations, which forbid destruction or seizure of property unless "imperatively demanded by the necessities of war."

37.     The IDF has recently recognized that their policy of demolition of homes of suspected terrorists — a form of collective punishment as it affects family members not believed to be associated with violence — has not worked to deter violence against it.  Recently, senior IDF officers concluded that the policy has caused more harm than good, and officially ended this policy of demolitions for this purpose in February of 2005.

However, home demolitions for other reasons have not been suspended.

**B.  Attacks against Human Rights Defenders**

38.   In recent years, the Israeli government has engaged in a practice of targeting Human
      Rights Defenders serving in the OPT.

39.   The IDF has consistently engaged in threats, intimidation, detention, retaliation, attacks,
      and other forms of targeting Human Rights Defenders for their attempts to legitimately
      exercise their right to protect the human rights of Palestinians living in the OPT.

40.   The United Nations Special Representative on the situation of Human Rights Defenders
      has expressed grave concerns regarding practices in the OPT that place human rights
      defenders at grave risk, stating that Human Rights Defenders in the OPT "operate under
      conditions that are absolutely incompatible with international norms and standards of
      human rights."

**C.  Plaintiffs' Specific Allegations**

41.   In January 2003, Rachel Corrie, then a 23 year old senior at the Evergreen State College
      in Olympia Washington, was involved in a local group called Olympians for Peace in the
      Middle East.  Before her trip to the OPT (Gaza), Rachel Corrie had been organizing
      events for Olympia's peace movement and on the Evergreen campus.  One of Rachel's
      main missions in traveling to this area was to create a sister-city relationship between
      Olympia and Rafah.

42.   For many years, various groups have organized non-violent action, medical assistance,
      and humanitarian relief in the OPT.  In the months preceding Rachel Corrie's death,
      efforts focusing on non-violent action had increased because of escalating violence,

including growing numbers of house demolitions. International human rights groups such as Amnesty International and Human Rights Watch, as well as the well-recognized Israeli human rights organization B'tselem, support the efforts of international volunteers as a means to confront and monitor persistent human rights violations.

43.     In the OPT (Gaza), Rachel Corrie joined a group of volunteers from around the world dedicated to using non-violent methods to work for Palestinian human rights and as peacemakers in the region. One of Rachel's most basic jobs entailed walking with Palestinian children to and from school to protect them from gunfire. In addition, Rachel Corrie regularly protected municipal water supplies, participated in youth education, and stood in front of Caterpillar bulldozers as a way to protect homes, farms, trees, and wells from demolitions that were in violation of international law.

44.     On March 16, 2003, Rachel Corrie was in the OPT (Gaza) to protest the demolition of homes and property of Palestinian civilians. The IDF had been demolishing homes and property in the area for an extended period of time, including several days prior to March 16, 2003. These demolitions were part of the IDF's larger plan to clear the way for a buffer zone and separation wall near the Egyptian-Gaza border. The IDF built the wall and buffer zone inside the demolished Palestinian area, rather than along the border; some two hundred meters of demolished houses separate the metal wall from the last rows of remaining houses. The wall runs approximately 100-150 meters from where the Nasrallah home once stood.

45.      There were two Caterpillar bulldozers involved in demolitions in that area on March 16,

2003.  The two Caterpillar machines were accompanied by one Armored Personnel

Carrier ("APC"), sometimes referred to as a "tank."  Moreover, each bulldozer contained

two IDF soldiers.  The Caterpillar bulldozer driver and accompanying soldier remained in

communication with those in the APCs via radio.

46.    In the afternoon on March 16, 2003, the group of volunteers Rachel Corrie was with

received a call indicating that IDF forces were approaching the home of a Palestinian

pharmacist, Dr. Samir Nasrallah, and that it was believed the IDF was going to destroy

the home.  The group knew Dr. Nasrallah, and Rachel Corrie had stayed in his home

several times, including recently.  The group of volunteers, including Rachel Corrie,

proceeded to that location.

47.    Rachel Corrie stood in front of the Nasrallah home in order to protect it from demolition.

There were no other structures between Rachel Corrie and the home.  Rachel was wearing

a bright orange flourescent vest or jacket.  She began waving her arms as the bulldozer

approached in an attempt to protect the home from demolition.  The bulldozer, which

contained two soldiers, one driver and the other Commander, also used for "spotting",

continued to approach the home, notwithstanding the presence of Rachel Corrie.  As the

bulldozer moved forward, it was pushing a pile of dirt and debris.  The bulldozer did not

stop as it reached Rachel Corrie; it pushed the pile of debris onto her legs and she could

not escape.  The bulldozer then ran over Rachel Corrie with its blade down, burying her

and crushing her beneath its blade.  Upon information and belief, the bulldozer driver

knew Rachel Corrie was in front of the bulldozer and intentionally ran her over.

48.    During this entire incident, other non-violent protesters, all of whom were within meters of the bulldozer, were running, jumping, and waiving their arms at the driver, yelling at the driver and the Commander that Rachel Corrie was on the pile and about to be run over.  The bulldozer never stopped until Rachel Corrie was beneath it.  It then backed up, with its blade remaining down, again driving over Rachel.  Rachel Corrie was taken to a hospital where she was later pronounced dead.

49.    Even though there was a "spotter" in the bulldozer, and even though there was an APC within close proximity to the bulldozer who was in contact with the bulldozer by radio, the bulldozer driver did not stop when approaching Rachel Corrie, and intentionally ran her over, crushing her.

50.    Just prior to this incident, the bulldozer drivers and/or the soldiers in the APCs had been aggressively shouting at the protestors.

51.    Earlier that same day, one of the bulldozer drivers was particularly aggressive, pinning one other protestor under rubble and another against a fence.

52.    Upon information and belief, just minutes before running over Rachel Corrie, the bulldozer driver who ran her over had received orders to continue with the demolitions, even with the protestors present.  Upon information and belief, the IDF was going to demolish the home Rachel Corrie tried to protect.  Months later, the Nasrallah home was demolished by the IDF.

**D.  The Role of Defendant**

53.    Defendant was Chief of Staff of the IDF at all relevant times herein, from his

-12-

appointment in July 9, 2002, to his retirement in February 2005.

54.    Upon information and belief, at all relevant times herein, the Southern Command, which
       is directly subordinate to the IDF Chief of Staff, was responsible for IDF operations in
       Gaza, where Rachel Corrie was killed.

55.    As IDF Chief of Staff, Defendant had command responsibility for the soldier(s) under his
       command who, upon information and belief, killed Rachel Corrie intentionally.

56.    Defendant failed to take appropriate and necessary measures to prevent the soldier(s)
       under his command from killing Rachel Corrie.

57.    Upon information and belief, Defendant failed to take appropriate and necessary
       measures to report, discipline or punish his subordinates for killing Rachel Corrie.

58.    Upon information and belief, as IDF Chief of Staff, Defendant told the Israeli cabinet that
       it "might be necessary to destroy hundreds of Palestinian homes in the Rafah refugee
       camp in order to improve security."

59.    Upon information and belief, the demolition of Palestinian homes, as well as attacks on
       civilians including human rights defenders, were carried out by the IDF pursuant to
       Defendant's orders or decisions in which he participated, and resulted in the death of
       Rachel Corrie.

60.    Upon information and belief, Defendant, acting singly and in concert with others,
       authorized, directed, planned, commanded, instigated, conspired, aided, abetted, incited,
       ratified, and/or is otherwise responsible for the acts that resulted in Rachel Corrie's death.

## VI.  CLAIMS FOR RELIEF

-13-

61.    Plaintiffs' causes of action arise under and violate domestic and international law, as defined in agreements, declarations, conventions, resolutions and treaties, including but not limited to the following:

    a)    Customary international law and treaties of the United States;

    b)    Statutes and common law of the United States of America;

    c)    Statutes and common law of the District of Columbia; and

    d)    Any other applicable laws, domestic, foreign, or international.

## VII.  FIRST CLAIM FOR RELIEF

*(War Crimes)*

62.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63.    The abuses described herein were acts against a civilian population and were war crimes.

64.    The home demolitions and attack on Rachel Corrie also constitute grave breaches and were war crimes.

65.    The acts and omissions constituting war crimes caused Plaintiffs to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

66.    Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## VIII.  SECOND CLAIM FOR RELIEF

### *(Extrajudicial Killing)*

67.  Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68.  Defendant and the bulldozer driver(s) who caused the death of Rachel Corrie acted under the actual or apparent authority and/or color of law of the IDF.

69.  The killing of Rachel Corrie was deliberate and not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples.  The killing was not lawfully carried out under the authority of any country or court.

70.  The killing of Rachel Corrie constitutes an extrajudicial killing as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (note)).  Additionally, the killing also constitutes a tort committed in violation of the law of nations, and thus of the United States, as reflected in federal common law which incorporates extrajudicial killing, pursuant to 28 U.S.C. §§ 1331 and 1350.  Thus, the conduct constitutes a violation of the law of nations and customary international law prohibiting extrajudicial killing, reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and is thus actionable.

71.  Upon information and belief, no adequate remedies are available to Plaintiffs under the laws or in the courts of the OPT (Gaza), which is the place in which the conduct giving

rise to the claim occurred, or in the State of Israel.

72.    Defendant's acts and omissions described caused Plaintiff and Decedent's next of kin to

suffer damages, including severe mental and emotional pain and suffering in an amount

to be proven at trial.

73.    Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious

and oppressive, and should be punished by an award of punitive damages in an amount to

be determined at trial.

## IX.  THIRD CLAIM FOR RELIEF

*(Cruel, Inhuman or Degrading Treatment or Punishment)*

74.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1

through 73 of this Complaint as if fully set forth herein.

75.    The abuses described herein constitute cruel, inhuman, or degrading treatment or

punishment ("CIDTP").  These acts include, but are not limited to:  the illegal destruction

of homes resulting in severe physical and psychological abuse and agony, humiliation,

fear and debasement, the injury and deaths from such destruction, and the attacks on and

other mistreatment and punishment of human rights defenders, resulting in profound fear

and anguish.

76.    Defendant's acts also constitute torts committed in violation of the law of nations, and

thus of the United States, as reflected in federal common law which incorporates

extrajudicial killing, pursuant to 28 U.S.C. §§ 1331 and 1350. Thus, the conduct

constitutes a violation of the law of nations and customary international law prohibiting

-16-

CIDTP as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities. Extrajudicial killing is similarly reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and is thus actionable.

77. Defendant's acts and omissions described caused Plaintiffs to suffer damages, including severe mental and emotional pain and suffering in an amount to be proven at trial.

78. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## X.  FOURTH CLAIM FOR RELIEF

*(Wrongful Death)*

79. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80. Defendant owed a duty to Decedent because she was a foreseeable victims of IDF's unlawful practices.

81. Defendant breached that duty by 1) authorizing, directing, planning, commanding, instigating, conspiring or participating in, aiding and abetting, inciting, or ratifying the acts that resulted in Rachel Corrie's death; and/or 2) failing to prevent the soldiers under his command from committing unlawful abuses including demolishing homes and killing civilians, causing severe emotional distress, when he knew or should have known they

-17-

were doing so, and it was reasonably foreseeable.

82. By so doing, Defendant committed negligence.

83. Rachel Corrie's death was caused by the actions of soldier(s) directly under the command and at the direction of Defendant, who deliberately, willfully, and intentionally, targeted her as she was attempting to protect the Nasrallahs' home from being demolished while they were inside.

84. As a direct and proximate cause of Defendant's breach of duty, Rachel Corrie was killed, which was reasonably foreseeable.

85. Cynthia Corrie and/or Craig Corrie are the personal representative(s) of Rachel Corrie's estate and bring this claim on behalf of all of Rachel's next of kin, including themselves and her siblings.

86. Defendant's acts and omissions described herein caused Plaintiffs and all of Decedent's next of kin, including her siblings, to suffer damages, including pecuniary damages, in an amount to be proven at trial.

87. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## XI.  FIFTH CLAIM FOR RELIEF

*(Negligence)*

88. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1

through 87 of this Complaint as if fully set forth herein.

89.    Defendant owed a duty to Decedent because she was a foreseeable victim of IDF's practice of demolishing homes and targeting human rights defenders.

90.    Defendant breached that duty by 1) authorizing, directing, planning, commanding, instigating, conspiring or participating in, aiding and abetting, inciting, or ratifying the acts that resulted in Rachel Corrie's death; and/or 2) failing to prevent the soldiers under his command from committing unlawful abuses including demolishing homes and killing civilians, causing severe emotional distress, when he knew or should have known they were doing so, and it was reasonably foreseeable.

91.    By so doing, Defendant has committed negligence.

92.    As a direct and proximate cause of Defendant's breach of duty, Plaintiffs and decedents were harmed.  It was reasonably foreseeable that use of Defendant's acts and/or omissions would cause this harm.

93.    Defendant's acts and omissions described caused Plaintiffs and Decedent to suffer damages in an amount to be proven at trial.

94.    Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## XII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment against the Defendant as follows:

a.    For compensatory damages in an amount to be proven at trial, but in an amount over $75,000;

b. For punitive and exemplary damages in an amount to be proven at trial;

c. For treble damages;

d. For reasonable attorneys' fees and costs of suit;

e. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

November 4, 2005                    _____/s/_____

JAMES R. KLIMASKI (#243543)
KLIMASKI & ASSOCIATES, P.C.
1819 L Street NW – Suite 700
Washington, DC 20036-3830
(202) 296-5600
(202)296-5601  Fax
Klimaski@klimaskilaw.com

MARIA C. LAHOOD
JENNIFER M. GREEN
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, NY  10012
Tel:  (212) 614-6430
Fax: (212) 614-6499
mlahood@ccr-ny.org

GWYNNE L. SKINNER
PUBLIC INTEREST LAW GROUP PLLC
705 SECOND AVENUE, SUITE 501
SEATTLE, WA  98104
Tel:  (206) 447-0103
Fax:  (206) 447-0115
gskinner@pilg.org

-20-